Michelle Gee
Seaport Law Group LLP
CA License 191490
503 Seaport Court, Suite 103
Redwood City, CA 94063
Phone: 650-293-0270

Email: michelle@seaportlg.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Dr. Martin Attilio Dominique Zizi**, <br><br> Plaintiff, <br> Vs. <br><br> **Loren K. Miller,** <br> In his Official Capacity, Director of the Nebraska Service Center, U.S. Citizenship and Immigration Services; <br><br> **Kenneth T. Cuccinelli,** <br> In his Official Capacity, Senior Official Performing the Duties of the Director, U.S. Citizenship and Immigration Service; <br><br> **Chad Wolf,** <br> In his Official Capacity, Acting Secretary, U.S. Department of Homeland Security; <br><br> **United States Citizenship and Immigration Services;** <br><br> **United States Department of Homeland Security;** <br><br> Defendant | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND REVIEW OF AGENCY ACTION UNDER THE ADMINISTRATIVE PROCEDURES ACT** <br><br> **Administrative Procedures Act Case.** |

**COMPLAINT FOR REVIEW OF AGENCY ACTION UNDER THE
ADMINISTRATIVE PROCEDURES ACT.**

## I.   INTRODUCTION

1.      This suit challenges the Defendants' arbitrary and unlawful decision to deny an immigrant visa petition in the employment-based first preference extraordinary ability (EB-1A) category filed by Dr. Martin Attilio Dominique Zizi (Plaintiff), a citizen and national of Belgium.

2.      Dr. Zizi's petition is based on his sustained national and international acclaim and recognized achievements in the field of biophysics, placing him among the small percentage of individuals who have risen to the top of the field.

3.      Dr. Zizi is an internationally recognized biophysicist. He holds an M.D. as well as a Ph.D., and is trained in Molecular Physiology, Public Health, and Biophysics. His thirty-plus year career has spanned academia, government, and private enterprise.  His post-doctoral work was with the Walter Reed Army Institute focused on biodefense, where he held high-level security clearances. He was the Medical Chief Scientific Officer and Chairman of the Bioethical Committee of the Belgian Defense. He performed expert missions for the UN as a Bioweapons Inspector in Iraq.  He is a recognized scholar in his field, with over sixty-five publications and a couple thousand citations, and has held various professor positions at Belgian institutes of higher education.  His more recent endeavors into private enterprise have resulted in at least eleven U.S. patents issued to him, and currently in use.  Seven of those patents are for the company he founded in 2015, Aerendir Mobile, Inc.  Dr. Zizi founded Aerendir Mobile based on his development of physiological biometric authentication technologies. He is currently the Founder and CEO of the California-based company, and

employs twelve people.

4.      The USCIS granted an O-1A nonimmigrant visa petition for Dr. Zizi to work in the U.S. as the CEO and Founder of Aerendir Mobile, and employ Dr. Zizi's expertise in the technological applications of biophysics so he could lead technological innovations for the company.  The O-1A nonimmigrant visa was based on his "extraordinary ability" in biophysics. Dr. Zizi then self-filed an immigrant visa petition in the comparable immigrant category, the EB-1A category that includes "extraordinary ability" in the sciences.  While the EB-1A immigrant visa petition was pending, Aerendir Mobile filed for an extension of Dr. Zizi's O-1A nonimmigrant visa status, which was approved.  Six days after approving the O-1A extension based on Dr. Zizi's extraordinary ability in biophysics, the USCIS denied the EB-1A immigrant visa petition based on nearly identical evidence.  The USCIS found that Dr. Zizi had not established even one of the requisite criteria for an EB-1 petition.

5.      Dr. Zizi filed an Appeal of the EB-1 Denial with the Administrative Appeals Office (AAO). The AAO dismissed the Appeal.

6.      This action is brought pursuant to Section 10B of the Administrative Procedures Act, 5 U.S.C. § 702, *et seq.*, seeking to hold unlawful and set aside the September 11, 2019 decision of the USCIS denying the EB-1A petition filed by Dr. Zizi, as well as the AAO dismissal of the appeal. The USCIS' denial of the EB-1A immigrant petition was arbitrary, capricious, and an abuse of discretion that is contrary to law.  The Court should therefore vacate the denial and direct the USCIS to approve Dr. Zizi's petition and grant him EB-1 status that he seeks and deserves.

## II. JURISDICTION

7.  This Court has jurisdiction over this action pursuant to 8 U.S.C.  §  1331 and 5 U.S.C.  §

702, since this is a civil action against the United States arising under the Immigration and Nationality Act, 8 U.S.C. § 1101, et. seq., and the Administrative Procedures Act (APA) 5 U.S.C. § 701, et. seq.

### III. VENUE

8.   Venue is proper under 28 U.S.C. § 1391(e)(1) because the Defendants are agencies of the United States and officers of the United States acting in their official capacity and 1) the Plaintiff resides in this district; and/or 2) a substantial part of the events or omissions giving rise to the claim occurred in this district.

### III. PARTIES

9.   Plaintiff, Dr. Martin  Attilio Dominique Zizi is a citizen of Belgium who has been working lawfully in the U.S. pursuant to an approved O-1A petition. His initial O-1A petition was approved by the USCIS for the period from September 19, 2016 to September 5, 2019, and his extension was approved for the period from September 5, 2019 to September 4, 2022.   The O-1A visa category is the nonimmigrant visa category for aliens of extraordinary ability in the sciences, arts, education, business, and athletics.

10. Defendant Loren K. Miller is the Director of the Nebraska Service Center, and he signed the Denial at issue in this case. Defendant Miller is sued in his official capacity.

11. Defendant Kenneth T. Cuccinelli is the Senior Official Performing the Duties of the Director of the USCIS and he is responsible for USCIS' policies, practices, and procedures and oversees the USCIS officer responsible for making the decisions at issue in this case. Defendant Cucinelli is sued in his official capacity.

12. Defendant Chad Wolf is the Acting Secretary of the Department of Homeland Security,

the federal agency encompassing USCIS which is responsible for administration and enforcement of the immigration and nationality laws of the United States. Defendant Wolf is sued in his official capacity.

13. Defendant U.S. Citizenship and Immigration Services (USCIS) is an agency of the Department of Homeland Security (DHS) and is responsible for overseeing the adjudication of immigration benefits.  The Administrative Appeals Office (AAO) is part of the USCIS, and exercises appellate jurisdiction over specific immigration case types filed with the USCIS.

14. Defendant U.S. Department of Homeland Security is a cabinet department of the U.S. federal government responsible for immigration-related services, enforcement, and investigations. DHS oversees USCIS and its implementation of federal law and policy with respect to immigration benefit applications.

## V.   THE "EXTRAORDINARY ABILITY" VISA

15. Pursuant to 8 U.S.C. § 1153(b)(1)(A), aliens may apply for a visa on the basis of "extraordinary ability" in the sciences, arts, education, business, or athletics.  The enabling regulations define "extraordinary ability" as a level of expertise indicating that the individual is one of that small percentage who have risen to the very top of their field of endeavor. 8 C.F.R. § 204.5(h)(2).  An alien can prove an extraordinary ability in one of two ways. The first is "evidence of a one-time achievement (that is, a major, international recognized award). 8 C.F.R. § 204.5(h)(3). The second way to prove extraordinary ability is to provide evidence of at least three of the following:

    i.    Documentation of the alien's receipt of lesser nationally or internationally recognized prizes or awards for excellence in the field of endeavor;

    ii.    Documentation of the alien's membership in associations in the field for which classification is sought, which require outstanding achievements of their members,

as judged by recognized national or international experts in their disciplines or fields;

iii.    Published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought. Such evidence shall include the title, date, and author of the material, and any necessary translation;

iv.    Evidence of the alien's participation, either individually or on a panel, as a judge of the work of others in the same or an allied field of specialization for which classification is sought;

v.    Evidence of the alien's original scientific, scholarly, artistic, athletic, or business-related contributions of major significance in the field;

vi.    Evidence of the alien's authorship of scholarly articles in the field, in professional or major trade publications or other major media;

vii.    Evidence of the display of the alien's work in the field of artistic exhibitions or showcases;

viii.    Evidence that the alien has performed in a leading or critical role for organizations or establishments that have a distinguished reputation;

ix.    Evidence that the alien has commanded a high salary or other significantly high remuneration for services, in relation to others in the field; or

x.    Evidence of commercial successes in the performing arts, as shown by box office receipts or record, cassette, compact disk or video sales.

16. Additionally, the regulation further provides that, "[i]f the above standards do not readily apply to the beneficiary's occupation, the petitioner may submit comparable evidence to establish the beneficiary's eligibility." 8 C.F.R. § 204.5(h)(4).

17.  In accordance with *Kazarian v. USCIS*, 596 F.3d 1115 (9th Cir. 2010), the USCIS takes a two-step approach in adjudicating an application for an immigrant of extraordinary ability.  At the first step, the USCIS limits its determination as to whether the petition is comprised of a

one-time achievement, or at least three of the ten regulatory criteria.  This first step is a quantitative step consisting of identifying and counting the evidence submitted.  If the applicant provides evidence for at least three of the enumerated criteria, the USCIS then proceeds to the second step and conducts a "final merits determination". At this second step, the USCIS then undertakes a qualitative analysis of all the evidence to determine whether the alien has sustained national or international acclaim in their field, indicating that they are one of the small percentage who has risen to the top of their field of endeavor.

18. The petition must also establish that the alien  seeks entry to continue working in their area of extraordinary ability.  8 U.S.C. § 204.5(h)(5).

19. If it is shown by a preponderance of the evidence that the EB-1A petition meets the established eligibility requirements for the benefit sought, the petition should be approved.  See *Matter of Chawathe*, 25 I & N Dec. 369, 375 (AAO 2010).

20. Expert opinion letters provided in support of visa petitions are probative if they are in accord with other information provided in the record and are not questionable in any way. *Matter of Caron International,* 19 I & N Dec. 791 (Comm 1988).

### VI. FACTUAL ALLEGATIONS

#### *The I-140 Petition*

21. On December 5, 2018, Dr. Zizi self-filed an EB-1A immigration petition for an alien of extraordinary ability in the sciences with the USCIS (LIN1990121967). The petition was based on his achievements in the field of biophysics and biomedicine over the last thirty years. As he did not have a one-time achievement, his petition was based on meeting at least three of the criteria enumerated at 8 C.F.R. § 204.5(h)(3).

22. Dr. Zizi received a Request for Evidence around April 18, 2019.  The USCIS concluded

that Dr. Zizi did not provide sufficient evidence to meet ANY of the enumerated criteria at 8

C.F.R.  § 204.5(h)(3). Dr. Zizi responded with additional evidence on approximately July 15,

2019.

23. Dr. Zizi's initial petition, as well as his response to the Request for Evidence actually

provided evidence to meet several of the criteria at  8 C.F.R. § 204.5(h)(3).

24. First, he provided extensive evidence to meet the criterion at 8 C.F.R.  § 204.5(h)(3)(v),

*evidence of the alien's original scientific, scholarly, artistic, athletic, or business-related*

*contributions of major significance in the field*.  Dr. Zizi provided:

**Documentation Showing Patents naming Dr. Zizi as an inventor, and how those**

**patents are of major significance in the field:**

(1) Five issued patents, and twenty-seven pending patents that form the basis of Aerendir

Mobile's business;  (2) A letter from Aerendir Mobile's General Manager explaining the

importance of the patents to the business and to the field; (3) Three issued patents granted to

Scanadu Inc., a mobile medical diagnostics company now known as Inui Health; (4) Letter from

FDA to Scanadu Inc. approving the patented products for the public; and (5) Letter from Scanadu

Inc. investor, Board member, and Chief Legal Counsel explaining the significance of the patented

products.

**Documentation showing patent-pending class of medications used for cancer**

**treatments, naming Dr. Zizi as an inventor, and expert letters discussing significance to the**

**field:**

(1) International patent application cover page for peptide-based drugs, pending with the

European Patent Office; (2) Expert letter from Professor Marco Colombini, Professor of Biology

at the University of Maryland, discussing significance of Dr. Zizi's patent-pending peptide-based drug research; (3) Expert letter from Professor Dr. Brugada, an internationally recognized expert known for his discovery of a disease which is named after him, discussing the significance of Dr. Zizi's original research into the novel new class of drugs;

**Documentation of Dr. Zizi's novel method for building clinical studies in biomedicine, and its importance to the field:**

(1) Expert letter of Dr. Brugada (mentioned above), discussing the originality of Dr. Zizi's work and its influence on the field.

**Documentation of Dr. Zizi's original research re "Balkan Syndrome", and its importance to the field:**

(1)     Letter from former Belgian Minister of Defense discussing work and its significance; (2) Expert letter from Professor Andre Robert Grivignee, Director for the Epidemiology Unit, Jules Bordet Institute (in Belgium), discussing Dr. Zizi's work and its significance.

25. Second, Dr. Zizi's initial petition as well as his response to the Request for Evidence provided evidence to meet the criteria at 8 C.F.R. § 204.5(h)(3)(vi), *Evidence of the alien's authorship of scholarly articles in the field, in professional or major trade publications or other major media*. Dr. Zizi provided his listing from Researchgate that shows he authored approximately sixty-eight publications in scholarly journals, and had over 2,000 citations. With his response to the Request for Evidence, he provided the first pages of the actual articles. His Google Scholar listing, provided with the response, showed over 2,300 citations.

26. Third, Dr. Zizi's initial petition as well as his response to the Request for Evidence

provided evidence to meet the criteria at 8 C.F.R. § 204.5(h)(3)(viii), *Evidence that the alien has performed in a leading or critical role for organizations or establishments that have a distinguished reputation.* Dr. Zizi set forth his leading and/or critical role with three organizations: (1) Aerendir Mobile, Inc., (2) Scanadu Inc. (now known as Innui Health), and (3) the Belgian Ministry of Defense.

27. Dr. Zizi founded Aerendir Mobile in 2015, and is the company's CEO. The company is based on his patented (and patent-pending) inventions. He has also raised several million dollars in investment funding. Evidence of this was provided with a letter from the CFO of Aerendir Mobile, verifying this. The distinguished reputation of the company was shown by industry publications naming Aerendir Mobile for the latest in biophysics and biotechnology innovation. He also included emails depicting contract negotiations with major industry participants, including Verizon, Dell, and organizations that contract with U.S. government agencies. The response to the Request for Evidence also included a letter from a Professor of San Francisco State University discussing the collaboration on a project, to further demonstrate that the reputation of Aerendir Mobile extends beyond industry and into academia.

28. Dr. Zizi was the Chief for Health and Science Integration with Scanadu Inc., from February 2011 until April 2014. To establish his critical role, he provided a letter from the company's former Chief Legal Counsel and Board Secretary to confirm his role in creating the company's new technology based on issued patents naming him as an inventor. The distinguished reputation of the company was shown by the FDA approval letter for the product Dr. Zizi developed, and the articles and media coverage of the company included with the petition.

29. Dr. Zizi was the Medical Chief Scientific Officer with the Belgian Ministry of Defense from 1998 to 2001, and then the Chief of Epidemiology and Biostatics Division from 2002 - 2007. To confirm the critical role he played within the Belgian Ministry of Defense, Dr. Zizi

provided a letter from the former Belgian Minister of Defense.   He discussed Dr. Zizi's role in: (1) conducting original research into Balkan Syndrome, (2) creating a biobank for deployed personnel, (3) setting up the Belgian Veteran Institute, and (4) contributing to the creation of a Burn Center.

30. Fourth, Dr. Zizi's initial petition provided  evidence to meet the criteria at 8 C.F.R. § 204.5(h)(3)(ix), *Evidence that the alien has commanded a high salary or other significantly high remuneration for services, in relation to others in the field.*  To meet this criteria, Dr. Zizi provided evidence of his salary of $220,000 annually. To show that it was high in relation to others in the field, he provided data from the U.S. Department of Labor showing that the highest level wage for a biophysicist, in Santa Clara county, was $135,803/year. Dr. Zizi's base salary was more than 60% higher than this at the time.

31. Fifth, Dr. Zizi's initial petition as well as his response to the Request for Evidence provided  evidence to meet the criteria at 8 C.F.R. § 204.5(h)(3)(viii), *Published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought.*  The initial petition included three articles from industry publications, discussing Dr. Zizi and his latest technology - articles in *findbiometrics.com, BiometricUpdate.com,* and *Techworld.*   The response to the Request for Evidence included two additional articles from an industry publication called *Digital Media.*

32. Sixth, Dr. Zizi's initial petition as well as his response to the Request for Evidence provided evidence to establish "comparable evidence", pursuant to 8 C.F.R. § 204.5(h)(4).  Dr. Zizi provided evidence that his receipt of major investment funding was comparable to 8 C.F.R. § 204.5(h)(3)(i), *Documentation of the alien's receipt of lesser nationally or internationally recognized prizes or awards for excellence in the field of endeavor.*  Dr. Zizi provided a letter from the President and CEO of a global investment firm that stated he invested $3 million into

Aerendir Mobile because of Dr. Zizi and his background, his new technology, and his reputation.

33. Dr. Zizi provided further "comparable evidence" that he is at the forefront in his field. He provided documentation that he was an invited, main-stage speaker at the National Association of Corporate Directors Global Board Leaders' Summit. The Summit included nationally recognized speakers such as FBI Director Christopher Wray. He also provided documentation that he was a member of the invitation-only Forbes Technology Council.

34. Despite Dr. Zizi describing his field as "biophysics and biomedicine" with his initial petition, throughout the Request for Evidence the USCIS adjudicator defined Dr. Zizi's field as "biometric technology using artificial intelligence and neurophysiology." Based on this incorrect interpretation of Dr. Zizi's field, the USCIS adjudicator dismissed several of Dr. Zizi's expert letters and supporting evidence as not relating to his field. Dr. Zizi sought to correct this error with his response to the Request for Evidence. He provided the Occupational Outlook Handbook's description for biophysicists to show the breadth of the discipline into the arenas of applied research, medicine, drug development, and technological innovation. As an expert in this field for over thirty years, he also explained the field of biophysics in his own words.

### *The I-140 Denial*

35. The USCIS denied Dr. Zizi's petition on September 11, 2019. After confirming that Dr. Zizi was not the recipient of a major internationally recognized prize or award, the USCIS then undertook the first step to determine whether Dr. Zizi has met at least three of the regulatory criteria at 8 C.F.R. § 204.5(h)(3). The USCIS again determined that Dr. Zizi had not met ANY of the criteria at 8 C.F.R. § 204.5(h)(3).

36. Throughout the Denial, the USCIS again mischaracterized Dr. Zizi's field. Instead of acknowledging the broad field of biophysics, the USCIS again incorrectly mischaracterized Dr.

Zizi's field as "biometric technology using artificial intelligence and neurophysiology" or as just "biometric technology". This incorrect interpretation of his field led the USCIS adjudicator to dismiss his original scientific contributions under the incorrect conclusion that they were in a different field. This incorrect interpretation also led the USCIS adjudicator to discount expert letters discussing the significance of his original scientific contributions, because the adjudicator incorrectly concluded the experts were in a different field. It also led the USCIS adjudicator to dismiss his record of scholarly publications, because the adjudicator again incorrectly concluded that the publications were also in a different field.

37. Under the criteria at 8 C.F.R. § 204.5(h)(3)(viii), *Published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought,* the USCIS concluded this criteria was not met because the articles were about Dr. Zizi's technology, and not about him. The USCIS drew this conclusion despite the fact that one article was an interview with Dr. Zizi, and the others quoted him and discussed his novel technology that he developed.

38. Under the criteria at 8 C.F.R. § 204.5(h)(3)(v), *evidence of the alien's original scientific, scholarly, artistic, athletic, or business-related contributions of major significance in the field*, the USCIS concluded that this criteria was not met for various reasons. These reasons included: expert letters discussed his work but that work was not in his field, expert letters obtained for the purpose of a petition do not carry weight (even though one letter submitted was drafted in 2008), scholarly articles and citations to show the significance of his innovations are not actually in his field, the FDA approved devices based on Dr. Zizi's patented technology are not actually based on his patented technology, and a failure to submit "preexisting, independent, and objective evidence that the innovations are widely utilized by scientists in the field, reaching far beyond your company, former employers, clients and customers."

39. Under the criteria at 8 C.F.R. § 204.5(h)(3)(viii), *Evidence that the alien has performed in a leading or critical role for organizations or establishments that have a distinguished reputation,* the USCIS concluded that Dr. Zizi did not submit sufficient evidence to establish the distinction of Aerendir Mobile or of Scanadu, and that the Belgian Ministry of Defense is <u>not</u> an organization or establishment.

40. Under the criteria at 8 C.F.R. § 204.5(h)(3)(ix), *Evidence that the alien has commanded a high salary or other significantly high remuneration for services, in relation to others in the field,* the USCIS concluded that the documentation Dr. Zizi submitted regarding his pay records and the U.S. Department of Labor wage information regarding the salary for a biophysicist in Santa Clara County, where Dr. Zizi works, has no probative value.  Even though Defendants' "field" of extraordinary ability is biophysics, the Defendants concluded that the evidence lacked probative value since it did not show what top CEOs in the field of biometric technology earn.

41. The USCIS also concluded that Dr. Zizi was precluded from using "comparable evidence" under 8 C.F.R. § 204.5(h)(4), because he had not shown that the other ten criteria do not readily apply to his occupation.  Therefore, the USCIS would not consider Dr. Zizi's receipt of over $3 million in venture capital funding as similar to being awarded a prize under 8 C.F.R. § 204.5(h)(3)(i), despite USCIS public guidance suggesting that receipt of venture capital funding can be used to show receiving an award for excellence in the field.

42. The USCIS never conducted the second-step, the "final merits determination", because it concluded that Dr. Zizi had not met at least three of the ten criteria. Accordingly, it denied the petition.

**The AAO Appeal**

43. On approximately October 11, 2019, Dr. Zizi appealed the Denial to the Administrative

Appeals Office, by filing a Notice of Appeal (LIN2090025958).

44. The Appeal was based on eight points: (1) The USCIS Director made erroneous conclusions of fact, by mischaracterizing Dr. Zizi's field of extraordinary ability, thereby disregarding decades of Dr. Zizi's achievements as not being in his field; (2) The USCIS erroneously disregarded all of Dr. Zizi's original scientific contributions of major significance in the field, including patents in use; (3) The USCIS erroneously concluded that publications about Dr. Zizi were not actually about Dr. Zizi; (4) The USCIS erroneously rejected twenty-five years of scholarly publications by Dr. Zizi; (5) The USCIS failed to recognize that Dr. Zizi's critical roles were in organizations with distinguished reputations; (6) The USCIS applied the law erroneously by imposing an improper prerequisite to use Comparable Evidence, that actually makes it impossible to ever use Comparable Evidence; (7) The USCIS failed to apply the Preponderance of the Evidence standard as a matter of law; and (8) The USCIS erroneously rejected all expert letters without finding anything in the record that did not support their testimony or making any other finding as to their credibility.

45. Dr. Zizi took this opportunity to supplement the record with even more evidence to establish his qualifications.  Dr. Zizi sought to establish that his "field" at issue is the broad field of biophysics,  to ensure that his achievements in this field over decades would be considered. Additional evidence included web pages from the Biophysical Society describing what biophysicists do, and where they work. (Additional Evidence p. 1-3).  Professor Marco Colombini, who provided an expert letter for the initial I-140 petition, provided an additional letter to further explain the field of biophysics and Dr. Zizi's contributions in this field.  Professor Colombini served on the governing Council of the Biophysical Society, and has had a long career in the field of biophysics. (Additional Evidence p. 4-9).

46. Additional documentation to further establish his original contributions of significance to

the field under  8 C.F.R. § 204.5(h)(3)(v) included new documentation of Dr. Zizi's original work with phages, and establishing an international non-profit organization to support phage research and phage therapy.  The documentation included web pages from the organization Dr. Zizi founded, screenshots of his Tedx talks on phages, and additional discussion about this work in the new letter from Professor Colombini.  (Additional Evidence p. 29 - 31).  Evidence regarding the phage research and nonprofit was not included with the initial I-140 petition, even though it was conducted years before the I-140 was submitted.

47. Other additional evidence to establish Dr. Zizi's original contributions included additional patents from Scandu that had been granted prior to filing the I-140 (Additional Evidence p. 12-14) and articles from major media discussing Scanadu and its inventions. (Additional Evidence p. 15-23). The additional articles about Scanadu were provided to also further show the distinguished reputation of Scanadu.

48.  Additional evidence was also provided to further corroborate Dr. Zizi's own record of achievements (i.e. Scholarly article abstract about his research into Balkan Syndrome, Additional Evidence p. 28), and to further corroborate the expert letter writers' assertions as well as their own credentials. (Additional Evidence p. 8-9, 24-27).

49. Additional evidence to establish 8 C.F.R. § 204.5(h)(3)(viii), *Evidence that the alien has performed in a leading or critical role for organizations or establishments that have a distinguished reputation,* included a 2014 letter written by the former Chief Science Officer of Scanadu (Additional Evidence p. 32), and the major media articles about Scanadu (Additional Evidence p. 15-23).  To argue that the Belgian Ministry of Defense is an "organization", Dr. Zizi included the dictionary definition of "organization" to show that an organization can include a government department. (Additional Evidence p. 33).  Further evidence of the distinguished reputation of Aerendir Mobile included the state DE 9 forms for 2018 and 2019, to show the

company employed from 12-14 salaried employees. (Additional Evidence p. 34-37).

50. Finally, other additional documentation included two additional patents issued to Dr. Zizi after the I-140 was submitted, but before the appeal was submitted.  (Additional Evidence p. 10-11). While acknowledging that these patents do not "count" for purposes of independently establishing the criteria at 8 C.F.R. § 204.5(h)(3)(v), *evidence of the alien's original scientific, scholarly, artistic, athletic, or business-related contributions of major significance in the field*, they were provided to further show that Dr. Zizi continues as a prolific inventor, consistent with being a scientist who is truly at the very top of their field.

**The AAO Denial**

51.  The AAO dismissed the appeal on July 21, 2020. The AAO concluded that Dr. Zizi did not meet at least three of the requisite criteria, so did not make a final merits determination.   In reaching their decision, the AAO stated that they only considered Dr Zizi's evidence for three of the evidentiary criteria:  original contributions, published material about him, and awards/comparable evidence. (p.11 of AAO Decision).  They stated that they did not need  to reach a decision on Dr. Zizi's evidence regarding scholarly articles and leading or critical role, after dismissing the other three criteria (p.11 of AAO Decision.)  They did not address Dr. Zizi's evidence of high salary anywhere in the Decision.  Like the USCIS, the AAO found that Dr. Zizi did not meet even one of the criteria.

52.  Under the criterion at  8 C.F.R. § 204.5(h)(3)(v), *evidence of the alien's original scientific, scholarly, artistic, athletic, or business-related contributions of major significance in the field*, the AAO addressed Dr. Zizi's patents for Aerendir Mobile, Dr. Zizi's patents for Scanadu, Dr. Zizi's original research into peptide-based drugs, Dr. Zizi's new methods for conducting clinical studies in biophysics, and Dr. Zizi's original research pertaining to Balkan Syndrome.

53. Despite being issued seven patents over three years for Aerendir Mobile, the AAO rejected these for not showing their significance in the field.   Although the patented technology forms the basis of Aerendir Mobile's business with the U.S. government and major technology companies, the AAO concluded that the impact was speculative, and therefore not significant in the field.  Because some of the letters describing the significance of the patented technology went even further in discussing how the technology *WILL* impact America's larger cybersecurity defense and *WILL* impact consumer wireless transactions, the AAO seized on the term "will" and concluded this means the patented technology has not yet impacted the field. The AAO also concluded that articles written about the patented technology prior to submitting the petition were insufficient to establish its significance.(AAO p.5-6).

54. The AAO also found that the issuance of FDA approval of Dr. Zizi's patented technology for use by Scanadu does not mean that the patented technology is significant in the field. The AAO cited a case about ballroom dancers to support this conclusion.  (AAO p. 6). The AAO further found that articles discussing this patented technology failed to indicate "widespread usage" in the field, with the incorrect implication that "widespread usage" is required in order to establish "major significance" in the field.

55. The AAO also found that the impact of Dr. Zizi's original research into peptide-based drugs for cancer therapy was speculative, and also not "of major significance".

56. The AAO similarly dismissed Dr. Zizi's new and novel way to build clinical studies in biophysics, as not being of "major significance".  Although the AAO acknowledged that the letter from Professor Dr. Brugada stated that Dr. Zizi's new methods led other scientists in the field to follow Dr. Zizi's approach, the AAO found that this was insufficient.  Dr. Brugada also referenced a scholarly publication about this approach, but the AAO found this insufficient to establish "major significance" because the AAO found that this article lacked a sufficient number

of citations.

57. The AAO concluded that Dr. Zizi's original field research on depleted uranium and Balkan Syndrome was also not of "major significance".  Dr. Zizi presented a letter from the former Belgian Minister of Defense to discuss the importance of Dr. Zizi's work, as well  the letter from Professor Grivegnee. The AAO concluded that the letters lacked detailed information establishing that Dr. Zizi's research resulted in a significant contribution to the field. The AAO referenced the article Dr. Zizi provided about this research, but concluded it lacked a significant number of citations.

58. The AAO dismissed Dr. Zizi's work and research on  phage research and phage therapy, as not evidence of an original contribution of major significance to the field.  In reaching this conclusion, the AAO quoted from the letter Dr. Zizi submitted from Dr. Colombini that discussed Dr. Zizi's original contributions in this area, and confirmed that Dr. Zizi gave a keynote on pages at the Pasteur Institute, and also gave a Ted talk on this topic.  The AAO noted that the articles in Dr. Zizi's Google Scholar listing that pertains to phages had citations ranging from 69 to 344, but concluded that this was not evidence of significance to the field.  The AAO decision states, "Once again, the Petitioner did not articulate the significance or relevance of the citations to his articles. For example, he did not demonstrate that these citations are unusually high in his field or how they compare to other articles that the field views as having been majorly significant."

59. In dismissing the content of the experts' letters, the AAO quoted from USCIS Policy Memorandum PM 602-0005.1 and stated, "Letters that specifically articulate how a petitioner's contributions are of major significance to the field and its impact on subsequent work add value."

60. Under the criterion at 8 C.F.R. § 204.5(h)(3)(viii), *Published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought*, the AAO concluded that the articles about Dr. Zizi's

technology were not about him, and that Dr. Zizi had not established that the digital media articles were considered major trade publications or other major media.  They also concluded that the author of one of the articles could not be determined. The AAO decision quotes from an article titled "Neurophysiologist finds new form of biometrics in the palm of his hand", and another one titled "New biometric modality "Neuro Finger-Print" invented by neurophysiologist".  In both of these articles, Dr. Zizi was the neurophysiologist referenced in the titles of the articles, and the "neuro finger-print" technology was Dr. Zizi's patented technology. These articles were about Dr. Zizi's new patented technology.  For the article that the AAO concluded lacked an author, the article was the content of an interview with the President of the publication, Dr. Zizi, and the Chairman of Aerendir Mobile.

61. In rejecting the digital articles, even though Dr. Zizi provided publishing information about the digital publications, the AAO stated other probative evidence was required to affirm the publications' assertions, such as "website traffic figures from third parties, demonstrating the websites' standings as major media." The AAO also included a footnote citing a USCIS Policy Memorandum that "evidence of published material in professional or major trade publications or in other major media publications about the alien should establish that the circulation, on-line or in print, is high compared to other circulation statistics and show the intended audience of the publication."

62. The AAO also rejected Dr. Zizi's efforts to use $3 million in venture capital funding as "comparable evidence" to 8 C.F.R. § 204.5(h)(3)(i), *Documentation of the alien's receipt of lesser nationally or internationally recognized prizes or awards for excellence in the field of endeavor.*  The AAO evaluated this criteria as both an actual *receipt of lesser nationally or internationally recognized prizes or awards for excellence in the field of endeavor,* as well as comparable evidence of that.  The AAO concluded that Dr. Zizi did not receive the venture

capital funding from Invus Group. Instead the company that he founded, and of which he presides as Founder and CEO did.  This is also despite the Invus Group letter stating that he met Dr. Zizi several years ago, and that his group made the investment based on Dr. Zizi's "background and mastery of his new, groundbreaking technology . . . "

63. The AAO  also cited from the USCIS  screenshots Dr. Zizi submitted with the petition, explaining that if "you" have received venture capital funding, then you can include that as evidence of eligibility for the EB-1 category.  The AAO highlighted that the USCIS screenshot stated "you", and argued that Dr. Zizi's company received the funding, not him personally.

64. The AAO discounted Dr. Zizi's argument that this should count as "comparable evidence" of an award because he did not establish that the awards criterion is not applicable to his occupation, and because he would first need to establish that the other criteria do not apply to his occupation.

65. For Dr. Zizi's argument that his invitations to be a main-stage speaker at prestigious events should also be considered "comparable evidence", the AAO addressed this in a footnote. They concluded that he could not use "comparable evidence" because he "did not show that at least three of the listed criteria do not readily apply to his occupation, he did not explain why he has not submitted evidence that would satisfy at least three of the criteria, and he did not establish why the evidence he has included is truly comparable to that required under 8 C.F.R. section 204.5(h)(3).

## STATEMENT OF CLAIMS

### COUNT ONE

### Violation of the Administrative Procedures Act

### 5 U.S.C. §701, et seq.

66.  Dr. Zizi realleges and incorporates by reference herein all of the allegations set forth

above.

67. The APA empowers this Court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

68. "While judicial review of agency decisions is highly deferential, it is not without teeth." *Raj & Co. v. U.S. Citizenship & Immigration Servs.*, 85 F. Supp. 3d 1241, 1248 (W.D. Wash. 2015). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). However, the APA empowers courts to "strike down an agency action as arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or if the agency's decision is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Turtle Island Restoration Network v. U.S. Dep't of Commerce,* 878 F.3d 725, 732 (9th Cir. 2017)(quoting Motor Vehicle Mfrs., 463 U.S. at 43).

69. Dr. Zizi met his burden of proving, by a preponderance of evidence, that he met at least three of the ten criteria at 8 C.F.R. § 204.5(h)(3).

70. Dr. Zizi was prejudiced and adversely affected and aggrieved by Defendants' determination that he lacked the prerequisite evidentiary showing that he is one of a small percentage of biophysicists who have risen to the top of the field and has received sustained national or international acclaim for his achievements which have been recognized in the field of biophysics, and Defendants' failure to consider his final merits determination under 8 CFR § 204.5(h)(2) and (3), following Defendants' misapplication of the regulations to the evidentiary

requirements, deprived him of a decision in accordance with the law.

71. Dr. Zizi established by a preponderance of the evidence that he established the criterion of original scientific contributions of major significance in the field.  Defendants acted in an arbitrary and capricious manner by injecting an additional requirement that the Petitioner's original contributions be of major significance "to" the field instead of "in" the field. 8 C.F.R. § 204.5(h)(3)(v) provides only that an individual's original contribution must be "of major significance *in* the field". It does not require that such contributions have "significantly impacted the entire field" or have been of "major significance to the field as a whole." So long as a person has shown that he or she made original scientific contributions of major significance *in* his or her field, then that person satisfies the criterion, whether or not he or she also shows that those contributions have already impacted the field in a major way.

72. The AAO improperly cited to the USCIS Policy Memorandum  (PM 602-0005.1) regarding supporting letters, as a basis for the unlawfully expanded criterion that original contributions must be "to" the field and have an "impact on subsequent work", in order to even be counted.  Although the AAO provided this footnote when discussing the supporting expert letters, nonetheless it followed this unlawfully expanded criterion when considering all the evidence of original contributions. Holding all of Dr. Zizi's evidence to this expanded criterion was unlawful and prejudicial to Dr. Zizi.  It fundamentally changed what is required to meet this criterion. Defendants may not "unilaterally impose novel substantive or evidentiary requirements" beyond those set forth in the regulations. *Kazarian v. USCIS*, 596 F.3d 1115, 1121 (9th Cir. 2010).

73. Defendants' failure to accept Dr. Zizi's issued patents as evidence of original contributions of major significance in the field was arbitrary and capricious. Defendants' reasoning regarding Dr. Zizi's patents - that the patents with Aerendir Mobile and with Scanadu

cannot be considered significant in the field because some of the letters discussing the impact of the patents also discuss how the patented technology WILL continue to impact the field, means that the patents have not yet had an impact on the field - is simply incorrect.  First, it arbitrarily imposes a requirement beyond the regulations that the original contribution must have "already significantly impacted the field in a major way." Second, Defendants' simplistic assertion ignores how scientific technology builds upon existing technology.  Providing the details of how scientific technology works, as is done in a published patent in exchange for its exclusive use, is significant in the field because it allows other scientists to build upon it and build around it.  Furthermore, the patents for Aerendir Mobile are in current use as they form the basis of their business. The patents for Scanadu obtained FDA approval for marketing the technology to the public, and articles about the technology were published in major media. Defendants' insistence that issued patents must show widespread use beyond the company that owns or licenses the patent in order to demonstrate its significant influence on the field, is contrary to the fundamental legal concept of exclusive use to a patent owner.

74.  Defendants' failure to accept Dr. Zizi's original contributions regarding phage research and phage therapy as original contributions of major significance in the field was arbitrary and capricious. Again, Defendants arbitrarily imposed an additional requirement that Dr. Zizi demonstrates how his original contributions have already impacted or influenced the field in a significant way.  Even so, the portion of Defendants' AAO decision explaining why Dr. Zizi's original contributions into phage research and therapy have not significantly influenced the field, actually does establish by a preponderance of the evidence how Dr. Zizi's phage research has been of major significance in the field.   The AAO decision lists the international non-profit organization he founded, P.H.A.G.E., lists his Tedx talk, lists his presentation at the Pasteur Institute,  cites an excerpt from an expert's letter discussing the significance of Dr. Zizi's phage

research, and lists Dr. Zizi's Google citations pertaining to phages, with citations per article ranging from 344 to 69.  Beyond acting in an arbitrary and capricious manner by requiring a showing of a major impact on the field, the Defendants further acted in an arbitrary and capricious manner by not considering the totality of this submission regarding phages when they evaluated the evidence of major significance.  Furthermore, the Defendants acted in an arbitrary and capricious manner by failing to accept citations as evidence of significance in the field because Dr. Zizi "did not articulate the significance or relevance of the citations to his articles."  Citations are evidence of influence in the field, and requiring a Petitioner to provide comparisons of numbers of citations to others in the field *in order to even use citations as evidence* is arbitrary and capricious, and imposes additional requirements not in the regulations.

75. Under the criterion for "published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field", Dr. Zizi established by a preponderance of the evidence that there was published material about him and his work in the field, in professional or major trade publications or other major media.  Defendants' insistence that these articles were actually not about Dr. Zizi and his work in the field was arbitrary and capricious, an abuse of discretion or not otherwise in accordance with the law.

76. Defendants' additional requirements regarding published material, that their existence and circulation be corroborated by objective, probative evidence such as "website traffic figures from third parties, demonstrating the websites' standings as major media", and that the circulation is "high compared to other circulation statistics", is arbitrary, capricious or not otherwise in accordance with law as it injects additional requirements not found in the regulations.  The regulations require published material to include the title, date, and author of the material.  Dr Zizi provided this. As Dr. Zizi's articles were in digital publications, the evidence included "About Us" information about the publication, as well as contact

information. Requiring website traffic figures, and requiring a showing of high circulation relative to other publications  is not found in the regulation. Defendants may not "unilaterally impose novel substantive or evidentiary requirements" beyond those set forth in the regulations. *Kazarian v. USCIS*, 596 F.3d 1115, 1121 (9th Cir. 2010).

77. Under the criteria for "lesser nationally or internationally recognized prizes or awards", Defendants' acted in an arbitrary and capricious manner by disregarding Dr. Zizi's receipt of $3 million in venture capital funding for Aerendir Mobile because the venture capital funding was not awarded individually to Dr. Zizi.  The notion that a venture capital firm would invest $3 million in a sole individual, without the structure of a legal business entity to issue shares, etc., is absurd. Venture capital companies invest in founders - founders of companies. The $3 million investment into Dr. Zizi's new company was an investment in Dr. Zizi as the founder and leader of his company, Aerendir Mobile.

78. Defendants' basis for declining to accept Dr. Zizi's receipt of $3 million in venture capital funding for Aerendir Mobile as "comparable evidence" of a lesser award under 8 C.F.R. § 204.5(h)(4) was arbitrary and capricious. Defendants again declined to attribute receipt of the funding to Dr. Zizi, since it was issued to the company he founded, and not him personally. Furthermore, this was arbitrary and capricious, and ultra vires, because it imposed a novel evidentiary requirement of first showing that eligibility for Dr. Zizi's occupation cannot be met using at least three of the criteria at 8 C.F.R. § 204.5(h)(3), before being able to rely on 8 C.F.R. § 204.5(h)(4). The regulation at 8 C.F.R. § 204.5(h)(4) simply states, "If the above standards do not readily apply to the beneficiary's occupation, the petitioner may submit comparable evidence to establish the beneficiary's eligibility."  The regulation does not require a showing that none of the criteria at 8 C.F.R. §204.5(h)(3) apply to the beneficiary's occupation before "comparable evidence" can be considered and counted.

79. Defendants acted in an arbitrary and capricious manner by dismissing, in a footnote, Dr. Zizi's "comparable evidence" of the criterion of "display at artistic exhibition and showcases". The AAO dismissed Dr. Zizi's evidence of his invitations to be a main-stage speaker at prestigious conferences as "comparable evidence" because he did not first establish that none of the criteria at 8 C.F.R. §204.5(h)(3) apply to the beneficiary's occupation before "comparable evidence" can be considered and counted.  Again, Defendants' assertion that a Petitioner must first establish that eligibility for Dr. Zizi's occupation cannot be met using at least three of the criteria at 8 C.F.R. §204.5(h)(3), before being able to rely on 8 C.F.R. § 204.5(h)(4) is an ultra vires evidentiary requirement.

## COUNT TWO

## Violation of the Administrative Procedures Act

## 5 U.S.C. §701, et seq.

80.  Dr. Zizi realleges and incorporates by reference herein all of the allegations set forth above.

81. Dr. Zizi was prejudiced and adversely affected and aggrieved by the AAO's failure to consider the evidence for more than three of the six criterion that Dr. Zizi submitted to the USCIS. The AAO only considered evidence of Dr. Zizi's (1) original contributions of major significance, (2) published material about him in professional or major trade publications, and (3) receipt of a lesser prize/comparable evidence. The AAO acknowledged Dr. Zizi's submitted evidence of his scholarly articles, and evidence of him playing a leading role in an organization with a distinguished reputation, but declined to address it. The AAO made no mention of Dr. Zizi's evidence submitted to the USCIS that he commanded a high salary in relation to others in his field.

82. Had the AAO considered the evidence of the other three criterion that Dr. Zizi submitted

to the USCIS, and found that the evidence satisfied the regulations, the AAO may have then made a final merits determination in favor of Dr. Zizi. By not considering this evidence submitted to the USCIS, Defendants acted in an arbitrary and capricious manner, and adversely prejudiced Dr. Zizi.

**COUNT THREE**

**Violation of the Administrative Procedures Act**

**5 U.S.C. §701, et seq.**

83.  Dr. Zizi realleges and incorporates by reference herein all of the allegations set forth above.

84. The USCIS improperly conflated step one, whether Dr. Zizi produced evidence to meet three criteria at  8 C.F.R. § 204.5(h)(3), with the step two "final merits determination". Pursuant to *Kazarian v. USCIS*, 596 F.3d 1115 (9th Cir. 2010), the first part of the *Kazarian* analysis is simply determining whether the evidence submitted meets the plain language requirements of at least three of the criteria at  8 C.F.R. § 204.5(h)(3)(i-x). This is NOT the stage for evaluating the quality of the evidence, or whether the evidence shows that the alien is one of the small percent who have reached the top of their field.  The first step is only to determine whether the applicant has met the evidentiary requirements.  The quality of the evidence is only considered **after** the USCIS first counts up at least three evidentiary criteria met by the applicant.

85. By evaluating the quality of the evidence in the first step, the USCIS was arbitrary and capricious by imposing a novel evidentiary requirement in their first step analysis pursuant to *Kazarian.*

86. Defendants improperly conflated the two *Kazarian* steps when considering 8 C.F.R. § 204.5(h)(3)(v), *evidence of the alien's original scientific, scholarly, artistic, athletic, or*

*business-related contributions of major significance in the field.*  Dr. Zizi provided evidence of issued patents, expert letters discussing the significance of his contributions, and evidence of scholarly articles with citations related to his work. This evidence met the plain language of the regulation. Defendants should have accepted this evidence of meeting the criterion, and THEN considered the quality of the evidence and whether it showed that he is at the top of his field. Nonetheless, the USCIS found that this criterion was not met.

87. Defendants improperly conflated the two *Kazarian* steps when considering 8 C.F.R. § 204.5(h)(3)(viii), *published material about the alien in professional or major trade publications or other major media, relating to the alien's work in the field for which classification is sought.* Dr. Zizi presented articles discussing him and his work. Defendants insistence that the articles about his technology were not about *"the alien's work in the field for which classification is sought"* , as well as their denial of the evidence because not enough corroborative data about the publications was provided, was another instance of Defendants improperly conflating the two *Kazarian* steps, in order to avoid counting this criterion.

88. Defendants improperly improperly conflated the two *Kazarian* steps when considering 8 C.F.R. § 204.5(h)(3)(ix), *Evidence that the alien has commanded a high salary or other significantly high remuneration for services, in relation to others in the field.*  Although Dr. Zizi provided evidence of his high salary relative to other biophysicists in the area based on Department of Labor wage data, Defendants concluded the evidence had no probative value. This finding that the evidence lacked probative value is exactly the type of evaluation undertaken in the second step of a *Kazarian* analysis.  By improperly conflating the two *Kazarian* steps and evaluating the probative nature of the evidence before acknowledging that this criterion was met, Defendants actions were arbitrary and capricious and prejudicial to Dr. Zizi.

89. Because Defendants did not grant these criteria, it concluded Dr. Zizi failed to meet the requisite three criteria, so it did not conduct a "final merits determination". This incorrect and arbitrary conclusion was prejudicial to Dr. Zizi. If the USCIS had found that Dr. Zizi's evidence at least met the threshold evaluation under *Kazarian* then it would have found that Dr. Zizi met three of the requisite regulatory criteria and would have then proceeded to a "final merits determination". Instead, Defendants cut its analysis short.

90. Defendants' determination that he lacked the prerequisite evidentiary showing that he is one of a small percentage of biophysicists who have risen to the top of the field and has received sustained national or international acclaim for his achievements which have been recognized in the field of biophysics, and Defendants' failure to consider his final merits determination under 8 CFR section 204.5(h)(2) and (3), following Defendants' misapplication of the regulations to the evidentiary requirements, deprived him of a decision in accordance with the law.

## **COUNT FOUR**

### **Violation of the Administrative Procedure Act**

### **5 U.S.C. § 705**

91. Dr. Zizi realleges and incorporates by reference herein all of the allegations set forth above.

92. Defendants acted in an "arbitrary and capricious" manner in their application of the "preponderance of the evidence" standard to Dr. Zizi's EB-1 petition. Defendants found that Dr. Zizi never established *even one* criterion for the EB-1 category.

93. The standard of proof for immigrant petitions in the EB-1 category is the preponderance of the evidence standard. Even if the Director has some doubt as to the truth, if the petitioner submits relevant, probative and credible evidence that leads the director to to believe that the

claim is "more likely than not", or "probably" true, the applicant has satisfied the standard of proof.  *U.S. v. Cardoza-Fonseca,* 480 U.S. 421 (1987) (discussing "more likely than not" as a greater than 50% chance of an occurrence taking place.)

94. Despite acknowledging all of Dr. Zizi's evidence of receipts of original contributions of significance in the field [(h)(3)(v)], published material about Dr. Zizi in major trade publications [(h)(3)(iii)], evidence of Dr. Zizi's scholarly articles in the field [(h)(3)(vi)], evidence that Dr. Zizi has performed a leading or critical role for organizations or establishments with distinguished reputations [(h)(vii)], evidence that Dr. Zizi commanded a high salary [(h)(3)(ix)], evidence of lesser awards and prizes through receipt of venture capital funding [(h)(3)(i)], and evidence that would qualify as "comparable evidence" [(h)(4)], by denying that any of this evidence met the preponderance of the evidence standard, Defendants misapplied this legal standard to the detriment of Dr. Zizi.

## COUNT FIVE

### Violation of the Administrative Procedure Act

### 5 U.S.C. § 705

95. Dr. Zizi realleges and incorporates by reference herein all of the allegations set forth above.

96. Defendants acted in an "arbitrary and capricious manner" by failing to act in good faith in their adjudication of Dr. Zizi's USCIS petition.  Despite providing multiple types of evidence showing his career in biophysics spanning more than thirty years, and providing additional, explanatory information about the field of biophysics with his response to the Request for Evidence, the USCIS adjudicator refused to ever acknowledge that Dr. Zizi's field of extraordinary ability is the field of biophysics.

97. The USCIS adjudicator dismissed Dr. Zizi's characterization of his own field of

expertise, and substituted his own theory of what Dr. Zizi's field actually is.  Despite Dr. Zizi's

efforts to correct this in his response to the Request for Evidence, the USCIS adjudicator acted

in bad faith, and in an arbitrary and capricious manner, by making up his own field in which to

evaluate Dr. Zizi's evidence.

98. When a career professional has accumulated thirty years of evidence of achievements in

their field, it is nonsensical to allege that much of that evidence is actually in a different field

from their self-identified field of achievement and expertise. Once the USCIS adjudicator made

up his own field in which to evaluate Dr. Zizi's evidence, the USCIS adjudicator was then able

to disqualify much of Dr. Zizi's evidence because Dr. Zizi's record of achievement was in a

different field than the one made up by the USCIS adjudicator.

99. Dr. Zizi was prejudiced and adversely affected and aggrieved by the USCIS adjudicator

acting without good faith in his adjudication of the petition, through his actions of  making up

his own field of extraordinary ability in which to evaluate Dr. Zizi's evidence.  This led the

USCIS to disregard evidence of Dr. Zizi's original contributions in the field and his record of

scholarly publications.  It also led the USCIS to disregard several of his letters written by other

experts in the field.   By wrongfully disregarding entire categories of Dr. Zizi's evidence,

Defendants acted in an arbitrary and capricious manner.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court grant the following relief:

(1) Assume jurisdiction over this matter;

(2) Declare that Plaintiff has met his burden of proving by a preponderance of the

evidence that he submitted evidence of at least 3 of the 10 required criteria of 8

C.F.R. § 204.5(h)(3)(i) - (x);

(3) Declare that Plaintiff has established by a preponderance of the evidence that he is one of a small percentage of biophysicists who have risen to the very top of the field, and has received sustained national or international acclaim for achievements which have been recognized in the field of biophysics, in accordance with 8 C.F.R. § 204.5(h)(2) and (3);

(4) Declare that Defendants' decision denying the petition requesting classification as an alien of extraordinary ability was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law pursuant to 5 U.S.C. § 706(2)(A);

(5) Order Defendants to vacate the denial of the I-140 immigrant petition and enter a decision approving the classification;

(6) Award plaintiff reasonable costs and attorney's fees under the Equal Access to Justice Act; and

(7) Award such further relief as the Court deems necessary or proper.


Dated this 7th day of November, 2020


/S/ Michelle Gee
Michelle Gee
CA191490
503 Seaport Court, Suite 103
Redwood City, CA 94053
Phone: 650-293-0270
michelle@seaportlg.com

COMPLAINT

33